UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| Michael Dahdah, | ) | Case No. 2:22-cv-11863-SJM/DRG |
| | ) | |
| Plaintiff, | ) | Hon. Judge Stephen J. Murphy, III |
| | ) | U.S. District Judge |
| v. | ) | Hon. David R. Grand |
| | ) | U.S. Magistrate Judge |
| Rocket Mortgage, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**<u>OPPOSITION TO MOTION TO COMPEL ARBITRATION</u>**
**(Request for Hearing)**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... ii

I.    INTRODUCTION ............................................................................................... 1

    A.    Michael Did Not Enter Into a Valid Contractual Arbitration Agreement ............. 1

    B.    Any Arbitration Agreement was Terminated ........................................ 3

    C.    The Claims are Not Subject to the Contract ........................................ 4

II.   FACTS ............................................................................................................... 4

III.  LAW AND ARGUMENT .................................................................................. 8

    A.    Arbitration Provisions are Not Favored but Treated Like Any Other
        Contract, and There is No Liberal Federal Policy Favoring Arbitration ............... 8

    B.    Standard of Review .............................................................................. 8

    C.    There Was No Valid Arbitration Agreement Formed ............................. 9

        1.    The Terms of Use Were Not Conspicuous and There was No
            Unambiguous Assent by Michael to Those Terms; Therefore, No
            Contract to Arbitrate was Formed .............................................. 9

            a.    The Notice of the Effect of Clicking the Calculate Button to
                be Bound to Terms of Use is Not Reasonably Conspicuous. ....... 10

            b.    There was No Assent to the Terms of Use. ............................... 14

        2.    Lack of Material Terms Renders the Purported Arbitration
            Agreement Void. .......................................................................... 17

        3.    The Agreement is Unconscionable. ............................................. 20

    D.    If There Was an Agreement, It Terminated Long Before the Calls at Issue ........ 23

    E.    The Claims are Outside the Contractual Relationship ........................... 24

IV.   CONCLUSION .................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ............ 2, 10, 13, 14, 15, 16

*Bright v. Am. Home Shield Corp*., No. 220CV02079KJMCKD,
    2022 WL 1626714 (E.D. Cal. May 23, 2022)................................................... 22

*Brooks v. IT Works Mktg., Inc.,* No. 121CV01341DADBAK,
    2022 WL 2079747 (E.D. Cal. June 9, 2022)..................................................... 9

*Hess v. Positive Energy Fleet, LLC*, 571 F. Supp. 3d 844 (E.D. Mich. 2021) ............................ 24

*Hill v. Quicken Loans Inc.,* No. EDCV190163FMOSPX,
    2020 WL 5358394 (C.D. Cal. Aug. 5, 2020) ................................................ 9, 15, 16

*Key Brands Int'l Ltd. v. Wilson*, No. CV1804060SJOJEMX,
    2019 WL 6622856 (C.D. Cal. Sept. 3, 2019)................................................... 18

*Ladas v. California State Auto. Ass'n*, 19 Cal. App.4th 761 (1993)............................................ 17

*MacClelland v. Cellco P'ship*, No. 21-CV-08592-EMC,
    2022 WL 2390997 (N.D. Cal. July 1, 2022) .................................................. 21, 22

*Morgan v. Sundance, Inc*., 212 L. Ed. 2d 753, 142 S. Ct. 1708 (2022)........................................ 8

*Morrison v. Cir. City Stores, Inc.,* 317 F.3d 646 (6th Cir. 2003) ................................................. 20

*Patrick v. Running Warehouse, LLC*, No. 221CV09978ODWJEMX,
    2022 WL 10584136 (C.D. Cal. Oct. 18, 2022) ............................................... 13

*RHUB Commc'ns, Inc. v. Karon*, No. 16-CV-06669-BLF,
    2019 WL 8267743 (N.D. Cal. Nov. 22, 2019)................................................. 18

*Shirley v. Rocket Mortg*., No. 2:21-CV-13007,
    2022 WL 2541123 (E.D. Mich. July 7, 2022).................................................. 16

*Shye v. Bookspan LLC*, No. 1:21-CV-12285,
    2022 WL 721525 (E.D. Mich. Mar. 9, 2022)................................................... 24

*Sifuentes v. Dropbox, Inc*., No. 20-CV-07908-HSG,
    2022 WL 2673080 (N.D. Cal. June 29, 2022) ......................................... 8, 9, 10, 13

*Streedharan v. Stanley Indus. & Auto., LLC*, No. 522CV0322MEMFKSX,
    2022 WL 4537859 (C.D. Cal. Sept. 27, 2022).................................................. 21

*SVGRP LLC v. Sowell Fin. Servs., LLC*, No. 16-CV-07302-VKD,
    2019 WL 652890 (N.D. Cal. Feb. 15, 2019).................................................... 17

### <u>Other Authorities</u>

*In the Matter of Rules and Regulations Implementing the Telephone Consumer
    Protection Act of 1991*, 18 F.C.C.R. 14014, 2003 WL 21517853 ........................................ 3, 23

I.      **INTRODUCTION**

About a week before **June 27, 2022**, Plaintiff Michael Dahdah ("Michael" or "Plaintiff") started receiving numerous calls from Defendant Rocket Mortgage ("Rocket" or "Defendant"). He had no account with Rocket and had no business dealings with them. He had never given Rocket permission to call him and never gave Rocket his number. His number had been on the Do Not Call Registry since 2017. Additional calls came in between June 27 and June 30, 2022, despite Rocket being previously told to stop. Plaintiff could not understand why he was getting these calls, as he had not sought any mortgage information for over a year and had no direct dealings with Rocket.

Rocket filed a Motion to Compel Arbitration based on an arbitration provision in the Terms of Use for LowerMyBills.com ("LMB").[1] Michael visited that site for the last time on **February 19, 2021.** He was not looking for mortgage products after the summer of 2021. The three visits to LMB were made from Plaintiff's cellular telephone, almost sixteen months before the calls at issue. Nothing related to those visits compels this Court to find a valid arbitration agreement or to order that the claims set forth herein are subject to arbitration.

A.      **Michael Did Not Enter Into a Valid Contractual Arbitration Agreement**

The first issue a court must resolve before compelling arbitration is whether there is a valid contract to arbitrate. Michael's visits to LMB did not create such a contract. If there is not a valid exiting agreement to arbitrate, the court may not compel arbitration.

First, the arbitration provision contained in the LMB Terms of Use cannot be enforced because the disclosures on LMB about the effect of clicking the calculate button were not conspicuous. "Courts are more reluctant to enforce browsewrap agreements because **consumers**

---

[1] Rocket Mortgage asserts that Michael entered into an agreement to arbitrate with Rocket Mortgage and LMB, but there is no agreement of any kind directly with Rocket Mortgage.

**are frequently left unaware that contractual terms were even offered**, **much less that continued use of the website will be deemed to manifest acceptance of those terms**."

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).

Michael submits evidence in the form of his Declaration that he reviewed the documents attached to Rocket's Motion to Compel Arbitration showing the LMB screens. His Declaration is the only evidence before this Court about the conspicuousness of the Terms of Use, result of clicking the calculate button and his assent to any terms. Michael declared that most of the LMB site was clear and readable. But Michael declared that the Terms and those related to the effect of clicking on the calculate button, and thereby agreeing to the Terms of Use, were not conspicuous to him, that he was unaware of the Terms, and that he would not have agreed to them if he had seen them. Thus, the Terms were not conspicuous and there was no assent to those Terms. Thus, there is no agreement to arbitrate.

Second, an arbitration agreement was never formed because it lacks material terms. It has none of the terms necessary for an arbitration. The provision would fail to meet the standards of AAA or JAMS for a consumer arbitration, and those entities would not be a potential forum for an arbitration. Thus, the arbitration provision is unenforceable.

Third, the Terms of Use and the arbitration provision are unconscionable. The Terms of Use are clearly a contract of adhesion. In addition to the lack of terms as set forth above, which gives Rocket complete control over the arbitration, the provision was not mutual as it provides that **You** agree to arbitration, not that both parties agree. The provision provides that all arbitrations must be in California. The Terms of Use have a jury waiver. The statute of limitations is shortened from four years to one year. There are limitations of liability and release

provisions that in essence prohibit claims for anything that could be covered by arbitration. Thus, the Terms of Use and the arbitration provision are unconscionable and void.

### B.     Any Arbitration Agreement was Terminated

Even if an arbitration agreement was formed, which is expressly denied, it had been terminated long before the calls at issue. The LMB Terms of Use (Ex. A-5 to the Motion to Compel) were drafted and solely controlled by LMB. The arbitration provision is contained in paragraph 2 of LMB's Terms of Use. The Terms of Use also has a Survival provision in paragraph 21 which states: "The following paragraphs shall survive termination or your refusal to continue to use the Service: 6, 7, 8, 10, 11, 12, 13, 14, 17 and 18." Arbitration is contained in paragraph 2 of the Terms of Use, and by LMB's own terms it **does not survive** termination of the agreement **or** Michael's refusal to continue use of the service, both of which occurred over a year before the calls at issue.

Under the TCPA, an inquiry like Michael's on LMB's website creates an established business relationship ("EBR") for three months. After three months, the relationship is terminated, and the business loses the right to call. The FCC, after noting that consumers are confused and frustrated when they receive calls from companies they have not contacted or done business with for many years, held: "The amended definition **permits the relationship**, once begun, **to exist for** … **three (3) months in the case of inquiries or applications**, …" *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 2003 WL 21517853 ("2003 Order"), ¶ 113 (emphasis added). Thereafter, the EBR is terminated.

There is no evidence that Michael engaged in any way with Rocket at any time, and he had no dealings with LMB at any time after February 19, 2021. Thus, any EBR with LMB terminated by law on **May 19, 2021.** Since there is no survivability provision for the arbitration

3

agreement, if it ever existed, it terminated on May 19, 2021; therefore, there was no agreement to arbitrate in existence in regard to calls made in 2022. Further, since Michael did not visit LMB's website or engage with LMB after February 19, 2021, pursuant to the Terms of Use, Michael had refused to continue using the service; therefore, the Terms of Use no longer applied. Since arbitration doesn't survive termination, it cannot now be used to compel arbitration.

C.     **The Claims are Not Subject to the Contract**

Rocket states in its Motion to Compel that the arbitration provision requires that Michael arbitrate any TCPA and other claims against Rocket **arising from his use of and submissions at LowerMyBills.com**. But the claims herein do not meet that criteria, and Rocket Mortgage has introduced no evidence that they do. Rocket's declarations state: "Rocket Mortgage's business records reflect that it contacted Plaintiff by telephone to respond to his requests for mortgage refinance information only after it received his requests." It does not say the calls were made arising from Michael's visits to LMB. Thus, Rocket has failed to produce any evidence that the calls were made pursuant to his submission to LMB, and arbitration cannot be compelled.

For these reasons, the Motion to Compel Arbitration should be denied.

II.    **FACTS**

About a week before June 27, 2022, Michael started receiving many calls from Defendant Rocket. (Declaration of Michael Dahdah, attached as Ex. 1, ¶ 2, hereinafter, "Declaration.") He has no account with Rocket and has had no business dealings with them. (Declaration, ¶ 3.) He never gave Rocket permission to call him and never gave Rocket his number. (Declaration, ¶ 4.) He has been on the Do Not Call Registry since 2017. (Declaration, ¶ 5.)

Michael answered some of the calls before June 27, 2022. (Declaration, ¶ 6.) On at least one call he answered, there was a pause before anyone answered, and then they said they were

4

from Rocket and were offering mortgage products. (Declaration, ¶ 7.) On that call, Michael told them he was not interested and to stop calling. Michael believes he answered more than one call before June 27, 2022, and told them to stop calling. (Declaration, ¶ 8.) On at least one of the calls he answered before June 27, 2022, there was silence; then he was disconnected. There was no prerecorded message or opt-out mechanism. Michael believes this happened more than once. (Declaration, ¶ 9.) The calls may have stopped for a few days and then began again on June 27, 2022. Michael recorded receiving eight calls between June 27 and June 30, 2022. The calls came at all hours and woke him at 5 o'clock in the morning. (Declaration, ¶ 10.) Michael answered at least one call of the eight. There was a pause, and then someone came on. They again said they were from Rocket offering mortgage products. Michael again told them to stop calling, but the calls continued for several more days. (Declaration, ¶ 11.) At least a week passed after he told them to stop calling the first time before the calls finally stopped. (Declaration, ¶ 12.)

Michael was looking for mortgage products in late 2020 and early 2021. He was not looking for mortgage products after the summer of 2021 and was not looking at all in 2022. (Declaration, ¶ 14.) Michael reviewed the documents from Rocket and believes that he visited the LMB site. (Declaration, ¶ 15.)

Michael reviewed the submission attached to the Motion to Compel Arbitration from his cellular telephone. Michael was able to see the clear text of all the information on the page, except that which was in gray. (Declaration, ¶ 16.) He did not even notice the information in gray, as it was generally below the big calculate button that had a large font and bright color. (Declaration, ¶ 17.) Michael found the information in gray was tiny and illegible, even with 20/20 vision. (Declaration, ¶ 18.)

Michael noted that the LMB website did not contain a check box that said by checking here you are agreeing to certain conditions, as he would expect if he was being asked to agree to something. (Declaration, ¶ 19.) Michael could not read any of the information below the calculate button in gray, or for that matter any of the information in gray. (Declaration, ¶ 20.) He never saw anything that would even suggest or hint at the fact that he would be bound to an arbitration clause, let alone with Rocket. If Michael had seen that he was giving up his right to go to court on the website, or other disagreeable terms, he would not have agreed to those terms. (Declaration, ¶ 21.)

Michael does not believe that the information in gray was conspicuous, as it was in much smaller font than the rest of the page and in a color that was much less visible than the surrounding materials, which were crystal clear. There were large colorful buttons and information all over the page that distracted from the small gray information. (Declaration, ¶ 22.) He would have believed that the calculate button was simply to provide him with a calculation of potential savings, and not binding him to anything. (Declaration, ¶ 23.)[2]

LMB's Terms of Use (Ex. A-5 to the Motion to Compel) have the following provisions:

2. **ARBITRATION.** YOU UNDERSTAND AND AGREE THAT ALL CLAIMS, DISPUTES OR CONTROVERSIES BETWEEN YOU AND LMB, AND ITS PARENTS, AFFILIATES, SUBSIDIARIES OR RELATED COMPANIES, INCLUDING BUT NOT LIMITED TO TORT AND CONTRACT CLAIMS, CLAIMS BASED UPON ANY FEDERAL, STATE OR LOCAL STATUTE, LAW, ORDER, ORDINANCE OR REGULATION, AND THE ISSUE OF ARBITRABILITY, SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION AT A LOCATION DETERMINED BY THE ARBITRATOR. … THIS ARBITRATION CONTRACT IS MADE PURSUANT TO A TRANSACTION IN INTERSTATE COMMERCE AND ITS INTERPRETATION, APPLICATION, ENFORCEMENT AND PROCEEDINGS HEREUNDER SHALL BE GOVERNED BY THE FEDERAL

---

[2] Before filing this lawsuit, Plaintiff's counsel contacted Rocket Mortgage to inquire about the calls. Rocket Mortgage would provide little information but did state that Rocket Mortgage obtained consent. No **mention of arbitration was ever made**, and Rocket Mortgage refused to produce the alleged consents.

ARBITRATION ACT ("FAA"). … THE PARTIES VOLUNTARILY AND
KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL.

THE PARTIES AGREE THAT THIS AGREEMENT HAS BEEN ENTERED INTO AT
LMB'S PLACE OF BUSINESS IN THE COUNTY OF LOS ANGELES, STATE OF
CALIFORNIA, AND ANY ARBITRATION, LEGAL ACTION OR PROCEEDING
ARISING OUT OF OR RELATING TO THIS AGREEMENT MUST BE
COMMENCED AND TAKE PLACE IN THE COUNTY OF LOS ANGELES, STATE
OF CALIFORNIA.

12. **Limitation of Liability.** IN NO EVENT WILL LMB BE LIABLE FOR ANY
DAMAGES, INCLUDING WITHOUT LIMITATION ANY INDIRECT,
CONSEQUENTIAL, SPECIAL, INCIDENTAL, OR PUNITIVE DAMAGES ARISING
OUT OF, BASED ON, OR RESULTING FROM THIS AGREEMENT OR YOUR USE
OF THE LMB WEBSITE OR SERVICE, EVEN IF LMB HAS BEEN ADVISED OF
THE POSSIBLITY OF SUCH DAMAGES. THESE LIMITATIONS AND
EXCLUSIONS APPLY WITHOUT REGARD TO WHETHER THE DAMAGES
ARISE FROM (1) BREACH OF CONTRACT, (2) BREACH OF WARRANTY, (3)
STRICT LIABILITY, (4) TORT, (5) NEGLIGENCE, OR (6) ANY OTHER CAUSE OF
ACTION, TO THE EXTENT SUCH EXCLUSION AND LIMITATIONS ARE NOT
PROHIBITED BY APPLICABLE LAW. IF YOU ARE DISSATISFIED WITH THE
SERVICE, YOU DO NOT AGREE WITH ANY PART OF THIS AGREEMENT, OR
HAVE ANY OTHER DISPUTE OR CLAIM WITH OR AGAINST LMB WITH
RESPECT THIS AGREEMENT OR THE SERVICE, THEN YOUR SOLE AND
EXCLUSIVE REMEDY IS TO DISCONTINUE USING THE SERVICE.

13. **Release.** YOU HEREBY AGREE TO RELEASE, REMISE AND FOREVER
DISCHARGE LMB AND ITS AFFILLIATES, SERVICE PROVIDERS, CLIENTS,
VENDORS, AND CONTRACTORS AND EACH OF THEIR RESPECTIVE AGENTS,
DIRECTORS, OFFICERS, EMPLOYEES, AND ALL OTHER RELATED PERSONS
OR ENTITIES FROM ANY AND ALL MANNER OF RIGHTS, CLAIMS,
COMPLAINTS, DEMANDS, CAUSES OF ACTION, PROCEEDINGS, LIABLITIES,
OBLIGATIONS, LEGAL FEES, COSTS, AND DISBURSEMENTS OF ANY
NATURE WHATSOEVER, WHETHER KNOWN OR UNKNOWN, WHICH NOW OR
HEREAFTER ARISE FROM, RELATE TO, OR ARE CONNECTED WITH YOUR
USE OF THE SERVICE.

21. **Survival.** The following paragraphs shall survive termination or your refusal to
continue to use the Service: 6, 7,
8, 10, 11, 12, 13, 14, 17 and 18.

22. **Statute of Limitations.** YOU AGREE THAT REGARDLESS OF ANY STATUTE
OR LAW TO THE CONTRARY, ANY CLAIM OR CAUSE OF ACTION ARISING
OUT OF RELATED TO USE OF THE SERVICE OR THE AGREEMENT MUST BE
FILED WITHIN ONE (1) YEAR AFTER SUCH CLAIM OR CAUSE OF ACTION
AROSE OR BE FOREVER BARRED.

### III.   LAW AND ARGUMENT

#### A.   Arbitration Provisions are Not Favored but Treated Like Any Other Contract, and There is No Liberal Federal Policy Favoring Arbitration

On May 23, 2022, the Supreme Court in *Morgan v. Sundance, Inc*., 212 L. Ed. 2d 753, 142 S. Ct. 1708 (2022) dispelled the long-standing misstatement that arbitration is favored over court proceedings. The Court held 9-0 that: "…The policy is to make 'arbitration agreements as enforceable as other contracts, **but not more so**.' (cite omitted) Accordingly, a court must hold a party to its arbitration contract just as the court would to any other kind. **But a court may not devise novel rules to favor arbitration over litigation."** *Morgan v. Sundance, Inc.*, 212 L. Ed. 2d 753, 142 S. Ct. 1708, 1713 (2022) (emphasis added). The Court went on to hold: "The federal policy is about treating arbitration contracts like all others, **not about fostering arbitration**." *Id.* at., 212 L. Ed. 2d 753, 142 S. Ct. 1708, 1713 (2022) (emphasis added). "Or put conversely, it is a bar on using custom-made rules, to tilt the playing field in favor of (or against) arbitration." *Id.* at, 212 L. Ed. 2d 753, 142 S. Ct. 1708, 1714 (2022). Thus, there is no preference for arbitration, and there can be no rule that favors arbitration.

The Northern District of California recently held likewise. "In determining whether an agreement was formed, the Court applies 'general state-law principles of contract interpretation,' **without a presumption in favor of arbitrability**." *Sifuentes v. Dropbox, Inc*., No. 20-CV-07908-HSG, 2022 WL 2673080, at *3 (N.D. Cal. June 29, 2022) (emphasis added).

#### B.   Standard of Review

"'A party cannot be required to submit to arbitration any dispute which he has not agreed to so submit.' (cite omitted) 'Before a party to a lawsuit can be ordered to arbitrate, and thus be deprived of a day in court, there should be an express, unequivocal agreement to that effect.' (cite omitted) To determine whether such an agreement exists, 'federal courts apply ordinary

state-law principles that govern the formation of contracts.'" *Hill v. Quicken Loans Inc.,* No. EDCV190163FMOSPX, 2020 WL 5358394, at *5 (C.D. Cal. Aug. 5, 2020).

"When the parties contest whether an agreement was formed, the party seeking to compel arbitration bears the burden of proving the existence of the agreement by a preponderance of the evidence. (cite omitted) Conversely, **the party opposing arbitration is entitled to the benefit of all reasonable doubts and inferences.** (cite omitted) Therefore, a court may find that an agreement to arbitrate exists as a matter of law '[o]nly when there is no genuine issue of fact concerning the formation of the agreement.'" *Sifuentes v. Dropbox, Inc.*, No. 20-CV-07908-HSG, 2022 WL 2673080, at *3 (N.D. Cal. June 29, 2022) (emphasis added).

### C.    There Was No Valid Arbitration Agreement Formed

The Court must first consider whether a valid arbitration contract was formed. "As the party alleging the existence of a contract, [defendants] ha[ve] the burden to prove each element of a valid contract—including mutual assent." *Brooks v. IT Works Mktg., Inc.,* No. 121CV01341DADBAK, 2022 WL 2079747, at *4 (E.D. Cal. June 9, 2022). Herein, there was no valid contract to arbitrate created for the three reasons stated below.

### 1.    The Terms of Use Were Not Conspicuous and There was No Unambiguous Assent by Michael to Those Terms; Therefore, No Contract to Arbitrate was Formed.

The validity of an online agreement depends on whether the user had actual or constructive notice of the purported agreement. "'Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms.' Berman, 30 F.4th at 856." *Sifuentes v. Dropbox, Inc*., No. 20-CV-07908-HSG, 2022 WL

2673080, at *4 (N.D. Cal. June 29, 2022). Here, Plaintiff denies actual knowledge of the Terms of Use and presents evidence that the notice of the Terms was not reasonably conspicuous and that he did not unambiguously manifest his assent to those Terms.

"…[r]easonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).[3] "Courts are more reluctant to enforce browsewrap agreements **because consumers are frequently left unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms**." *Id*. (emphasis added).

### a.   The Notice of the Effect of Clicking the Calculate Button to be Bound to Terms of Use is Not Reasonably Conspicuous.

The first inquiry is whether the notice related to the Terms of Use is reasonably conspicuous. "… the onus [is] on website owners to put users **on notice of the terms to which they wish to bind consumers.**" *Sifuentes v. Dropbox, Inc.*, No. 20-CV-07908-HSG, 2022 WL 2673080, at *3 (N.D. Cal. June 29, 2022). And the issue is not if the Terms of Use hyperlink was in blue, but whether the Terms of Use was reasonably conspicuous.

The notice herein does not give notice of the Terms of Use. This is borne out by the testimony of Michael. Michael testified that by clicking the calculate button, he expected to get a calculation of his mortgage savings, not to be bound to Terms of Use, which were otherwise unknown to him because they were hidden on the website. (Declaration, ¶ 23.) When reviewing the submission attached to the Motion to Compel Arbitration from his cellular telephone,

---

[3] Rocket stipulates that California law applies. (Motion to Compel, pg. 15.)

Michael was able to see the clear text and color of all the information on the page, except that which was in gray that contained the disclosure about the effect of clicking the calculate button and the Terms of Use. (Declaration, ¶ 16.) He did not even notice the information in gray, as it was generally below the big calculate button that had a large font and bright color. (Declaration, ¶ 17.) The information in gray was tiny and was very illegible, even though he has 20/20 vision. (Declaration, ¶ 18.)

The website did not contain a check box that said by checking here you are agreeing to certain conditions, as Michael would expect if he was being asked to agree to something. (Declaration, ¶ 19.) Michael never saw anything that would suggest, or even hint, at the fact that he would be bound to an arbitration clause. (Declaration, ¶ 21.) If he had seen that he was giving up his right to go to court on the website, or other disagreeable terms, he would not have agreed to those terms. (Declaration, ¶ 21.)

On the other hand, Rocket presents no evidence that the disclosure is conspicuous. All Rocket has shown is an enlarged screen shot of the pages. If the disclosures are conspicuous, why did Rocket enlarge and isolate them?

Rocket asserts that Michael hit the calculate button several times. But this is irrelevant, as will be discussed *infra*. The fact that the Terms of Use was in blue does not change the fact that the website does not inform a consumer of the terms to which he will be bound.

If this Court were to look at the screens presented by Rocket on a cell phone, as opposed to the enlarged screens Rocket submitted in its video, a much different picture is painted. The gray is very difficult to read and is much smaller and a different color than other text.

But based on Rocket's video presentation, there is one time before any disclosure is made where a consumer hits the calculate button with no disclosure at all about Terms of Use, but

11

simply to proceed. There is also a press to continue button the consumer clicks before any notice. Therefore, it is perfectly reasonable for a person to expect that clicking the same button in the future would simply give you mortgage calculation results as would the name of the button-calculate.

After the consumer has already clicked two buttons without any notice about Terms, the next calculate button appears to be on a page with a large ad for Quicken Loans. On what appears to be the next screen are a large what appears to be evaluation section and then below that in gray, with no hyperlink, additional information. There is nothing therein about agreeing to any Terms. Below the next calculate button it talks about agreeing to be contacted by LMB, and then it talks about Terms, all in significantly smaller gray font and above a large ad. The privacy policy is also there in blue. Also below that is another large section regarding evaluation. Above the next calculate button there is more gray text that doesn't talk Terms of Use at all. It says: "Enter your phone number above to receive automated and/or prerecorded calls only from us and/or the providers that are matched to you." Below the calculate button are more terms in gray with hyperlinks in blue to LMB Provider, Rocket, customercare@coredigtal and other items.

When the notice that Terms exist is below the calculate button, it is not only in gray and difficult to read, but there are several other items that distract from the Terms of Use, such as hyperlinks in blue to the MB Provider Network, solar services, home improvement services and home insurance services. There are also some large Quicken advertisements that further distract from the purported disclosure.

The contrast between the clear text which they want you to read, and the gray text they don't, is stark. "'[O]nline providers have complete control over the design of their websites,' and therefore have the responsibility to put users on notice of the terms to which they wish to bind

12

consumers. Id.[Citing to Berman] at 857." *Sifuentes v. Dropbox, Inc.*, No. 20-CV-07908-HSG, 2022 WL 2673080, at *4 (N.D. Cal. June 29, 2022). Here, LMB chose to disguise the existence of the Terms of Use by first having the user click the calculate button twice with no disclosure, then putting the information in gray as opposed to the rest of the website which was in larger font and clearer colors, and finally hiding it among other blue hyperlinked items. Remember, this was being viewed on a cell phone. "To be conspicuous, a browsewrap agreement 'must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it.'" *Patrick v. Running Warehouse, LLC*, No. 221CV09978ODWJEMX, 2022 WL 10584136, at *5 (C.D. Cal. Oct. 18, 2022).

The Court in *Berman* found that a similar disclosure to the one herein was not conspicuous. Like the LMB website, the *Berman* website had a comparatively large box displaying the zip code and a large green "continue" button. In *Berman,* the page had two lines of text in a tiny gray font, which stated: I understand and agree to the Terms & Conditions which includes mandatory arbitration and Privacy Policy. *Berman v. Freedom Fin. Network, LLC*, at 30 F.4th 849, 854 (9th Cir. 2022). In this case, there was the tiny gray font, but no notice regarding arbitration. There was not one word about arbitration on any of the LMB pages that Michael was asked to go through.

The Court in *Berman* found such notice was not reasonably conspicuous. The Court held:

First, to be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it. **The text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye. The comparatively larger font used in all of the surrounding text naturally directs the user's attention everywhere else. And the textual notice is further deemphasized by the overall design of the webpage, in which other visual elements draw the user's attention away from the barely readable critical text. Far from meeting the requirement that**

13

**a webpage must take steps "to capture the user's attention and secure her assent," the design and content of these webpages draw the user's attention away from the most important part of the page.**

**Website users are entitled to assume that important provisions—such as those that disclose the existence of proposed contractual terms—will be prominently displayed, not buried in fine print.** Because "online providers have complete control over the design of their websites," (cite omitted) "the onus must be on website owners to put users on notice of the terms to which they wish to bind consumers," *Nguyen*, 763 F.3d at 1179. The designer of the webpages at issue here did not take that obligation to heart."

*Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856–57 (9th Cir. 2022) (emphasis added).

The website here has the same deficiencies as the one in *Berman*. LMB could have made a clear disclosure to parties coming to the site but chose not to. The user clicks one calculate button and one click to proceed button with no mention of Terms of Use. Then, the disclosures above the button are in gray, illegible, and do not have a hyperlink to the Terms in blue. One does not even mention Terms of Use. Finally, the disclosures below the button are in gray, while they do have a blue hyperlink to the Terms, are still illegible and cluttered with many other disclosures, including a blue hyperlinked list of providers and blue hyperlinked referrals to solar and insurance entities. There is nothing that makes the Terms of Use stand out. And then there is a great big Quickens Loan ad. This does not provide reasonably conspicuous notice of the Terms to which the consumer will be bound. Thus, no agreement was formed based on the Terms of Use, and arbitration cannot be compelled.

### b.   There was No Assent to the Terms of Use.

Rocket must also prove manifest assent. But clicking the calculate button (which was bold, colorful and clear) does not indicate an intent to be bound by the inconspicuous Terms; it indicates an intent to get a calculation regarding refinancing. Michael testified that he did not assent to the Terms of Use.

The *Berman* court found a lack of assent in a very similar situation to the one herein. "Defendants rely on plaintiffs' act of clicking on the large green 'continue' buttons as manifestation of their assent, but merely clicking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything. A user's click of a button can be construed as an unambiguous manifestation of assent **only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement.**" *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022) (emphasis added). "The presence of '**an explicit textual notice that continued use will act as a manifestation of the user's intent to be bound**' is critical to the enforceability of any browsewrap-type agreement. *Id*. at 30 F.4th 849, 857–58 (9th Cir. 2022) (emphasis added). Here, the same deficiency dooms Rocket's claims. There was no explicit notice that continued use would act as a manifestation that the user intended to be bound by the Terms. Instead, as Michael testified, he would never have thought that calculating his potential savings would bind him to Terms of Use with an arbitration provision that he had never seen. Thus, no agreement to arbitrate was ever formed.

A California court recently refused to compel arbitration based upon the same LMB website. In *Hill v. Quicken Loans Inc.,* No. EDCV190163FMOSPX, 2020 WL 5358394, at *6 (C.D. Cal. Aug. 5, 2020), the Court denied Quicken Loan's motion to compel arbitration based upon a visit to the LMB website. While the evidence was slightly different, the Court held: "In any event, the court is persuaded that the subject declarations …, raise a reasonable inference that anyone could have entered the type of personal information plaintiff entered onto the subject websites, never pressed the submit buttons, and experienced the same result. *See*, *e.g.*, *Hansen v.*

*Rock Holdings, Inc.*, 434 F.Supp.3d at 825-26 & n. 2" *Hill v. Quicken Loans Inc.*, No. EDCV190163FMOSPX, 2020 WL 5358394, at *6 (C.D. Cal. Aug. 5, 2020).

The Court in *Shirley v. Rocket Mortg.*, No. 2:21-CV-13007, 2022 WL 2541123(E.D. Mich. July 7, 2022), cited by Rocket, was addressing a different set of facts than those herein and, respectfully, misapplied *Berman*. Perhaps the court was misled by what appears to have been a demonstration on a large screen or printout of the website. In this case, Rocket has attempted to show the forms in what is a clearly enlarged format. But that is not what a visitor to the website on an iPhone would see.

Further, in *Shirley*, Plaintiff did not put forth a declaration that the website did not provide conspicuous notice, that he had no actual notice, and that he did not assent as Michael does herein. Thus, the case was factually different.[4]

And while the court in *Shirley* appeared to apply the holding in *Berman v. Freedom Fin. Network, LLC,* 30 F.4th 849 (9th Cir. 2022), it respectfully did not apply *Berman* correctly as set forth above. The *Shirley* court appears to have focused mostly on the blue hyperlink below the calculate button, not the surrounding information which was unclear and hid the Terms of Use, and which failed to reveal the effect of clicking on the calculate button.[5]

Therefore, because Michael never agreed to the hidden terms, no arbitration agreement was formed.

---

[4] Plaintiff herein also raises defenses that were not raised in *Shirley*.

[5] This is at least the third case in a short time where the LMB website Terms were unknown to the user, demonstrating that the terms are not conspicuous.

### 2.    Lack of Material Terms Renders the Purported Arbitration Agreement Void.

The second reason no contract to arbitrate was formed is because the arbitration provision lacks material terms and is therefore unenforceable.[6] While the clause provides for "arbitration," it includes no forum for that arbitration (e.g., AAA or JAMS); no provision for how many arbitrators will hear the case; no provision for how the arbitrator(s) will be chosen; no provision regarding the right to representation; no provision for the consumers' rights if they are unhappy about the arbitrator selected or what happens if none can be agreed upon; no provision for costs; no provision as to the length of the agreement; no rules to govern the arbitration; no provision regarding injunctive relief; no provision for a small claims exception; no provision for discovery; and no provision for what law is to be applied. To say that material terms are lacking is an understatement. Further, because of the lack of these terms, neither AAA or JAMS will handle the arbitration, rendering the likelihood that there is no forum to hold the arbitration. The lack of material terms makes it impossible to determine if LMB or Rocket breached the arbitration provision. Any one of these is material, but the lack of all of them makes the agreement unenforceable.

In order for acceptance of a proposal to result in the formation of a contract, the proposal must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain. *SVGRP LLC v. Sowell Fin. Servs., LLC*, No. 16-CV-07302-VKD, 2019 WL 652890, at *6 (N.D. Cal. Feb. 15, 2019). If, by contrast, a supposed contract does not provide a basis for determining what obligations the parties have agreed to, and hence does not make possible a determination of whether those agreed obligations have been breached, there is no contract. *Id.,* citing to *Ladas v. California State Auto. Ass'n*, 19 Cal.

---

[6] This argument has no disputed facts.

17

App.4th 761, 770 (1993) ("Where a contract is so uncertain and indefinite that the intention of the parties in material particulars cannot be ascertained, the contract is void and unenforceable.").

Thus, the failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have agreed upon some of the terms or have taken some action related to the contract. *RHUB Commc'ns, Inc. v. Karon*, No. 16-CV-06669-BLF, 2019 WL 8267743, at *4 (N.D. Cal. Nov. 22, 2019). "Under California law, ... **To be enforceable, the terms of the contract must also be certain.** *Magna Dev. Co. v. Reed*, 228 Cal.App.2d 230, 235-26 (Cal.Ct.App.1964) ('It is well established, however, that where a party seeks specific performance of a contract, the terms of the contract must be complete and certain in all particulars essential to its enforcement'); see Cal. Civ.Code § 3390(e) ('The following obligations cannot be specifically enforced: an agreement, the terms of which are not sufficiently certain to make the precise act which is to be done clearly ascertainable'). On summary judgment, a court can decide whether a contract existed as a matter of law if there are no genuine issues of material fact." *Key Brands Int'l Ltd. v. Wilson*, No. CV1804060SJOJEMX, 2019 WL 6622856, at *6 (C.D. Cal. Sept. 3, 2019). The arbitration clause as set forth above lacks any material terms.

Second, it does not meet either JAMS' or AAA's **minimum** requirements. Thus, it lacks the material terms to be enforceable. JAMS' Minimum Standards for Arbitration Procedures (https://www.jamsadr.com/consumer-minimum-standards) provides that JAMS will administer arbitrations pursuant to mandatory pre-dispute arbitration clauses between companies and consumers **only if** the contract arbitration clause and specified applicable rules comply with the following **minimum standards of fairness.** These include the following provisions which are

not contained in the LMB arbitration clause: 1. That the arbitration agreement must be reciprocally binding on all parties. (The LMB provision provides: YOU UNDERSTAND AND AGREE THAT ALL CLAIMS, DISPUTES OR CONTROVERSIES BETWEEN YOU AND LMB, … SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION. Thus, the agreement is unilateral.); 2. That remedies that would otherwise be available to the consumer under applicable federal, state or local laws must remain available under the arbitration clause, unless the consumer retains the right to pursue the unavailable remedies in court. (There is nothing in the LMB provisions about the remedies available.); 3. That the consumer must have a reasonable opportunity to participate in the process of choosing the arbitrator(s). (There is no provision in the LMB clause for arbitrator selection, who gets to do it, consumers rights, dispute resolution.); 4. That the consumer must have a right to an in-person hearing in his or her hometown area. (The provision at issue says the consumer must travel to LA for any arbitration.); 5. With respect to the cost of the arbitration, when a consumer initiates arbitration against the company, the only fee required to be paid by the consumer is $250, which is approximately equivalent to current Court filing fees. (There is nothing in the LMB provision regarding costs.); 6. All other costs must be borne by the company, including any remaining JAMS Case Management Fee and all professional fees for the arbitrator's services. (There is nothing regarding this in the LMB provision.); and 7. That the arbitration provision must allow for the discovery or exchange of non-privileged information relevant to the dispute. (There is nothing regarding discovery in the LMB provision.) Thus, the LMB agreement fails to address seven minimum standards as set forth by JAMS, and JAMS would not hear the case.

Nor does it meet AAA minimum requirements. The AAA can decline administration of arbitration demands where an arbitration clause contains material violations of the Consumer

Due Process Protocol which includes: consumers have a right to an independent and impartial arbitrator and independent administration of their dispute; costs of the process for the consumers must be reasonable; location of the proceeding must be reasonably accessible; no party may have unilateral choice of arbitrator; arbitrators should be empowered to grant whatever relief would be available in court; all parties retain the right to seek relief in small claims court for disputes or claims within the scope of its jurisdiction; parties to the dispute must have access to information critical to resolution of the dispute; in consumer arbitration proceedings, the consumer's administrative fee is capped at $200; and, the business pays the arbitrator's compensation unless the consumer – post dispute – voluntarily elects to pay a portion of the arbitrator's compensation. None of these nine issues are addressed in the LMB provision, demonstrating that it is lacking material terms; therefore, no contract was formed.

"[A]n arbitration agreement that prohibits the use of the judicial forum as a means of resolving statutory claims **must also provide for an effective and accessible alternative forum.**" *Morrison v. Cir. City Stores, Inc.,* 317 F.3d 646, 658 (6th Cir. 2003) (emphasis added). Here, neither of the two main arbitral forums would hear this case; and it is not clear that Michael could vindicate his statutory TCPA rights in an arbitration under the LMB provision. There is no effective and accessible alternative forum under the LMB provision. Because the arbitration provision lacks any material terms and would deny Plaintiff the right to an effective forum, the agreement is invalid and cannot be enforced.

### 3.    The Agreement is Unconscionable.

"Under California law, 'a contractual provision is unenforceable if it is both procedurally and substantively unconscionable.' *Kilgore v. KeyBank, Nat'l Ass'n,* 718 F.3d 1052, 1058 (9th Cir. 2013) (citing omitted) These two prongs operate on a sliding scale: the lesser the procedural unconscionability, the greater substantive unconscionability must be shown, and vice versa."

*MacClelland v. Cellco P'ship*, No. 21-CV-08592-EMC, 2022 WL 2390997, at *4 (N.D. Cal. July 1, 2022).

An arbitration agreement is "at least minimally procedurally unconscionable if it is a contract of adhesion. *Ting v. AT&T,* 319 F.3d 1126, 1148 (9th Cir. 2003). As explained in Ting, '[a] contract is procedurally unconscionable if it is a contract of adhesion, i.e., a standardized contract, drafted by the party of superior bargaining strength, that relegates to the subscribing party only the opportunity to adhere to the contract or reject it.'" *MacClelland v. Cellco P'ship,* No. 21-CV-08592-EMC, 2022 WL 2390997, at *5 (N.D. Cal. July 1, 2022).

California law requires an arbitration agreement have a modicum of bilaterality, and arbitration provisions that are unfairly one-sided are substantively unconscionable. *Streedharan v. Stanley Indus. & Auto., LLC*, No. 522CV0322MEMFKSX, 2022 WL 4537859, at *14–20 (C.D. Cal. Sept. 27, 2022).

Here, the purported arbitration agreement and the Terms of Use are both procedurally and substantively unconscionable. First, the Terms of Use, if binding, which is denied, are a contract of adhesion and, therefore, at least minimally procedurally unconscionable.

Since this is a minimal finding, the Court must find significant substantive unconscionability to void the agreement. Here, that test is easily met. First, the arbitration provision itself is unconscionable for the reasons set forth above. It would effectively deny an alternative forum and has no terms to provide for the minimal right both AAA or JAMS have set forth. It may allow Rocket to control all of the terms of any arbitration, including the selection of the arbitrator, the rules of arbitration, costs and the right to discovery. It certainly provides no guidance on those issues. The arbitration agreement also requires that all arbitration be in

California, as opposed to the location of the consumer. This type of arbitration agreement is unusual today as courts have regularly found them to be unconscionable.

Second, the arbitration agreement is unilateral. It provides that You, the consumer, is bound to arbitrate and contains no such promise from LMB. Only the consumer is bound to its terms. "In *Nyulassy*, '[t]he arbitration clause plainly contain[ed] only a unilateral agreement to arbitrate' so claims by the defendant employer were 'not subject to the arbitration clause.' (cite omitted) 'Agreements to arbitrate must contain at least a modicum of bilaterality to avoid unconscionability.'(cite omitted)." *Bright v. Am. Home Shield Corp.*, No. 220CV02079KJMCKD, 2022 WL 1626714, at *4 (E.D. Cal. May 23, 2022).

Third, the Terms of Use, of which the arbitration provision is part, shortens the statute of limitations from four years to one year. "A contractual clause restricting the period in which an arbitration may be commenced is unconscionable where the period is 'far shorter' than that otherwise available under California law." *MacClelland v. Cellco P'ship*, No. 21-CV-08592-EMC, 2022 WL 2390997, at *7 (N.D. Cal. July 1, 2022).

Fourth, the Terms of Use have a jury waiver. "Courts have held that an arbitration agreement is unenforceable where it 'require[s] plaintiffs to waive in advance their right to a jury trial for any dispute for which arbitration is not allowed by law.'" *MacClelland v. Cellco P'ship*, No. 21-CV-08592-EMC, 2022 WL 2390997, at *7 (N.D. Cal. July 1, 2022).

Fifth, the Terms of Use have limitation of liability and release clauses that purport to prevent any claim that might be arbitrated in advance. These provisions purport to negate any arbitration provision or obligation of LMB and are therefore unconscionable.

Thus, not only is the entire Terms of Use unconscionable, but the arbitration provision itself is unconscionable and is, therefore, void and unenforceable.

**D.     If There Was an Agreement, It Terminated Long Before the Calls at Issue**

The arbitration provision is contained in ¶ 2 of LMB's Terms of Use. Those Terms of Use (Ex. A-5 to the Motion to Compel) also have a survivability provision in ¶ 21 which states: "The following paragraphs shall survive termination or your refusal to continue to use the Service: 6, 7, 8, 10, 11, 12, 13, 14, 17 and 18." Since Arbitration is contained in ¶ 2 of the Terms of Use, it does not survive termination of the agreement or Michael's refusal to continue use of the service, both of which occurred over a year before the calls at issue.

Under the TCPA, an entity like Rocket may only use an inquiry like Michael's for three months after the inquiry barring further engagement by the customer. After that, the relationship and right to call is terminated. The FCC ruled that:

> We conclude that the Commission's current definition of "established business relationship" should be revised. **We are convinced that consumers are confused and even frustrated more often when they receive calls from companies they have not contacted or done business with for many years.** The legislative history suggests that it was Congress's view that the relationship giving a company the right to call becomes more tenuous over time…. Therefore, the Commission has modified the definition of established business relationship to mean: "a prior or existing relationship formed by a voluntary two-way communication between a person or entity and a residential subscriber with or without an exchange of consideration, …or on the basis of the subscriber's inquiry or application regarding products or services offered by the entity **within the three (3) months immediately preceding the date of the call**, which relationship has not been previously terminated by either party." … The amended definition **permits the relationship**, once begun, **to exist for** … **three (3) months in the case of inquiries or applications**, unless the consumer or the company "terminates" it.

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18 F.C.C.R. 14014, 2003 WL 21517853 ("2003 Order"), ¶ 113 (emphasis added).

"… arbitrability survives the expiration of the underlying contract **only if** '(1) [the dispute] involves facts and occurrences that arose before expiration; (2) an action taken after expiration infringes a right that accrued or vested under the agreement; or (3) under normal principles of contract interpretation, the disputed contractual right survives expiration of the

remainder of the agreement.'" *Shye v. Bookspan LLC*, No. 1:21-CV-12285, 2022 WL 721525, at

\*9-10 (E.D. Mich. Mar. 9, 2022).

There is no evidence that Michael engaged in any way with Rocket at any time and had

no dealings with LMB at any time after February 19, 2021. Thus, the agreement was terminated

by law at the latest on **May 19, 2021. S**ince there is no survivability provision for the arbitration

agreement, it expired on May 19, 2021, and cannot be enforced in regard to calls made in 2022.

It is also quite clear that after February 19, 2021, Michael had refused to continue to use the

service; therefore, under the Terms of Use, the agreement was terminated long before the calls in

question. Since there is no valid current contract to arbitrate, arbitration cannot be compelled.

### E.     The Claims are Outside the Contractual Relationship

> Adopting a rule applied by other courts, it held that the key to deciding whether a
> dispute falls within the scope of an arbitration clause is whether "[the] action
> could be maintained without reference to the contract or relationship at issue."
> (cite omitted) …"Relating to," the court determined, is limiting language that
> requires "more than the barest factual connection" between a claim and a
> "pertinent contractual relationship."

*Hess v. Positive Energy Fleet, LLC*, 571 F. Supp. 3d 844, 850 (E.D. Mich. 2021). "The mere

'existence of a contract between the parties does not mean that every dispute between the parties

is arbitrable.'" *Id.* at 851.

Here, the action can be maintained without reference to the LMB provision. Rocket

presents no evidence that the claims are within the scope of the arbitration agreement. In fact, in

setting the issues up, it states precisely what is missing. Rocket states that the arbitration

provision requires that Michael arbitrate any TCPA and other claims against Rocket **arising**

**from his use of and submissions at LowerMyBills.com**. But there is simply no evidence to

support that the calls arose from Michael's submission on LMB; and, in fact, it is likely not true.

According to Rocket, Michael last visited LMB in **February of 2021**. Yet, the calls at issue did not occur until **June 27, 2022,** and thereafter. Why would there be no calls for over sixteen months after a request for a quote? Plaintiff never engaged with Rocket, never had any communication about a loan with Rocket and never indicated that he wanted more information from Rocket. In fact, just the opposite, he told them to stop calling.

In all the evidence presented by Rocket, there is only one line about the calls. In the Declaration of Amy Courtney (¶ 10), she states: "Rocket Mortgage's business records reflect that it contacted Plaintiff by telephone to respond to his requests for mortgage refinance information only after it received his requests." The Declaration is woefully deficient to establish that the calls at issue were as a result of Plaintiff's alleged visit to LMB. It does not state that the calls at issue were the result of the inquiries at LMB. Thus, Rocket has not set forth sufficient evidence to prove the claim is within the scope of the arbitration agreement, and the claims on their face appear to be outside the arbitration agreement.

## IV.    CONCLUSION

For the reasons set forth above, Rocket's Motion to Compel Arbitration should be denied.

Dated: November 11, 2022

Respectfully submitted,

/s/ *Amy L. Bennecoff Ginsburg*
Amy L. Bennecoff Ginsburg
LawHQ, P.C.
299 S. Main St. #1300
Salt Lake City, UT 84111
385-285-1090
amy.ginsburg@lawhq.com