UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL DAHDAH,                                    Case No. 22-11863

     Plaintiff,                                  F. Kay Behm
v.                                                 United States District Judge

ROCKET MORTGAGE, LLC,

     Defendant.
_____ /

**OPINION AND ORDER DENYING MOTION FOR
RECONSIDERATION (ECF No. 32) and GRANTING MOTION FOR
LEAVE TO FILE AN AMENDED COMPLAINT IN PART (ECF No. 31)**

## I.    PROCEDURAL HISTORY

Plaintiff, Michael Dahdah, filed this action under the Telephone Consumer

Protection Act, 47 U.S.C. § 227, against Rocket Mortgage, LLC ("Rocket") on

August 11, 2022.  (ECF No. 1).  Rocket filed a motion to compel arbitration and a

separate motion to dismiss under Rule 12(b)(6).  (ECF Nos. 11, 12).  After a

hearing, the court granted the motion to dismiss the complaint and denied the

motion to compel arbitration as moot.  (ECF No. 26).  Dahdah filed a motion for

reconsideration, arguing that the court erred by (1) not deciding the motion to

compel arbitration first, in accordance with applicable law; and (2) not allowing

Dahdah the opportunity to amend the complaint to cure any deficiencies.  (ECF

No. 27).  The court granted the motion for reconsideration, denied the motion to compel arbitration, and allowed Dahdah to file a motion for leave to amend the complaint.  (ECF No. 30).  Dahdah then filed a motion for leave to amend the complaint (ECF No. 31) and Rocket filed a motion for reconsideration of the order denying the motion to compel arbitration, primarily arguing that the record evidence did not support the court's conclusion about the necessity of scrolling to reach the Terms of Use and that the applicable caselaw does not support the court's conclusion that the placement of the disclosure above or next to the assent button is of "critical importance."  (ECF No. 32).  Rocket also argues that the court erred by denying the motion to compel arbitration without conducting a limited trial on the factual disputes.  *Id*.  These motions are fully briefed.

For the reasons set forth below, the court **DENIES** the motion for reconsideration and **GRANTS** the motion for leave to amend the complaint in part.  The court finds Count III in the proposed amended complaint to be futile, but Plaintiff may file his amended complaint as to Counts I, II, and IV within 14 days of entry of this Opinion and Order.

## II.      MOTION FOR RECONSIDERATION

### A.      Legal Standard

Eastern District of Michigan Local Rule 7.1(h)(2) allows a party to file a

motion for reconsideration of a non-final order within 14 days of the entry of the

order.  Such motions are "disfavored," and must demonstrate one of the

following:

> (A) The court made a mistake, correcting the mistake
> changes the outcome of the prior decision, and the
> mistake was based on the record and law before the
> court at the time of its prior decision;
>
> (B) An intervening change in controlling law warrants a
> different outcome; or
>
> (C) New facts warrant a different outcome and the new
> facts could not have been discovered with reasonable
> diligence before the prior decision.

E.D. Mich. LR 7.1(h)(2)(A)-(C).

### B.      "Scrolling" and Proximity of Assent Button

Rocket argues that the court erred in two respects when analyzing whether

it had demonstrated that it provided reasonably conspicuous notice of its Terms

of Use, which include an arbitration provision.  First, it says that the court

improperly relied on the need for "scrolling" when manual scrolling was not

supported by the record.  Second, Rocket argues that the court incorrectly analyzed the proximity of the assent button in its conspicuousness analysis.

As explained in the court's earlier decision, Rocket relies on an "inquiry notice theory," under which an enforceable contract will be found only if: "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Berman v. Freedom Financial Network, LLC*, 30 F.4th 849, 856 (9th Cir. 2022).  This analysis "depends on the design and content of the website and the agreement's webpage." *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1177 (9th Cir. 2014).  "[T]o be conspicuous in this context, a notice must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856.  The *Berman* court found the webpages at issue did not provide reasonably conspicuous notice for several reasons.  *Id*.  First, the text disclosing the existence of the terms and conditions was printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and in a font so small that it is barely legible to the naked eye.  *Id*. at 856-57.  The court further noted that the comparatively larger font used in all of the surrounding text naturally directs the user's attention

everywhere else.  *Id*. at 857.  The court also found that the textual notice was

further deemphasized by the overall design of the webpage, in which other visual

elements draw the user's attention away from the barely readable critical text.

Far from meeting the requirement that a webpage must take steps "to capture

the user's attention and secure her assent," the design and content of these

webpages draw the user's attention away from the most important part of the

page.  *Id*. (quoting *Nguyen*, 763 F.3d at 1178 n. 1).

The pertinent part of this court's analysis on conspicuousness reads as

follows:

> While the notices here do not suffer from the
> "distracting" elements noted in *Gaker*, the tiny light gray
> font, located *below* the large green or purple "Calculate"
> button, weigh against a finding of inquiry notice.
> Additionally, some scrolling to see the full notice before
> clicking on the "Calculate" button is required, which
> suggests that a user is less likely to notice the text and
> more likely to click the button before reading.  *Gaker*,
> 2023 WL 1777460, at *6 (citing *Sullivan v. All Web Leads,
> Inc.*, No. 17-C-1307, 2017 WL 2378079, at *7 (N.D. Ill.
> June 1, 2017) ("a consumer is less likely to be bound to
> terms agreed to on the internet where [as here] the
> terms were located below the 'accept' or 'submit'
> button[.]").  And, the small gray font stands in contrast
> to the larger, bolder, black font used for most of the text
> on all the webpages a user sees during their visit.  *See
> Daschbach*, 2023 WL 2599955, at *10 ("That is a major
> design flaw that arguably draws the user's attention
> away from the key language at the time when it should
> be calling the most attention to it.").  Like the courts in

*Daschbach* and *Gaker*, this court concludes that it "is not indisputable to the court that a reasonably prudent internet user would have seen the fine print and hyperlinks." *Daschback*, 2023 WL 2599955, at *10.  As observed in *Meyer*, if "reasonable minds could disagree" about the conspicuousness of the notice, that may be sufficient to defeat a motion to compel arbitration. *Meyer*, 868 F.3d at 76 (citing *Nicosia*, 834 F.3d at 237).  Said differently, "only if the undisputed facts establish that there is reasonably conspicuous notice of the existence of contract terms" can a court find that a valid agreement to arbitrate has been formed.  *Id*. at 75. The court cannot reach that conclusion here.  Viewing the facts in the light most favorable to Dahdah, the court concludes that Rocket fails to establish inquiry notice under the first element of the *Berman* test.  Further, the court need not decide whether Rocket satisfies the second element of the *Berman* test.  *Daschbach*, 2023 WL 2599955, at *10.  The motion to compel arbitration is, therefore, denied.

(ECF No. 30, pp. 28-30).

According to Rocket, the record is devoid of any evidence that "scrolling" was required for Dahdah to see the disclosure containing the hyperlink to the Terms of Use.  Rocket points the court to the video that it claims depicts the same user experience that Dahdah would have had in 2020 and 2021.  (ECF No. 11-2, ¶ 39; Exhibit 4).  The first time the "Calculate" button appears, a user appears to need to scroll down to see the Terms of Use link below the calculate button.  The two screenshots of the video below show when the calculate button first appeared (left) and when the scrolling reached the Terms of Use link (right):



(Exhibit 4, Screenshots taken 1:01 and 1:30).  When the second "Calculate"

button appears, a user appears to need to scroll through the page to provide all

the requested information and to reach the "Terms of Use" link below the

"Calculate" button:



(Exhibit 4, Screenshots taken at 1:59 and 2:00).  Where the third "Calculate"

button appears, a user appears to need to scroll to see the Terms of Use link

below where the last information inputted by the user shows on the screen:



(Exhibit 4, Screenshots taken at 3:12, 3:17).

Rocket maintains that manual "scrolling" was not required to see the disclosure containing the Terms of Use link because the website is "dynamic," meaning that the user completes the submission forms and the webpage automatically moves up to adjust the fields and screen into the user's view without the need for manual scrolling by the user.  In its opinion and order, the court did not describe the scrolling as "manual," but acknowledges that could be

inferred from its description.  However, whether described as "scrolling" or "automatic movement," the user experience here stands in contrast to other cases where the link to the terms and the assent button are found in close proximity on a "single screen."  *See e.g.*, *Selden v. Airbnb, Inc.*, 4 F.4th 148, 157 (D.C. Cir. 2021).  Accordingly, while the court may have inartfully suggested that the "scrolling" here was "manual scrolling" by the user, the court did not make a mistake that requires a different outcome by referring to "scrolling" in its analysis, instead of using the more precise characterization of "automatic movement."

Additionally, the remainder of the court's analysis and its conclusion that Rocket did not provide reasonably conspicuous notice is well-supported by applicable case law.  Rocket takes issue with the court's analysis regarding proximity and its emphasis on the disclosure being below the assent button, rather than above.[1]  Rocket's argument suggests that this aspect of the court's proximity analysis was dispositive, however, it was but one factor to be considered in the conspicuousness analysis.  For example, in *Selden v. Airbnb*, a case cited by Rocket, the notice was below the assent button, but the text was

---

[1] Rocket also points out that one disclosure included the text above the button.  (ECF No. 11-4).  It true that above the purple calculate button, there is small light grey text that provides "By clicking the button below, you acknowledge, consent, and agree to our terms at the bottom of the page."  *Id*.  However, the hyperlinked terms were located below the assent button.  *Id*.

larger in comparison to the text of the assent button than the text here (as

compared to the calculate button) and was in black font, not light grey:



(*See Seldon*, 4 F.4th at 152, screenshot from Exhibit 4).  And importantly, the

court observed that the buttons appeared in close proximity to the notice and "on

a single screen."  *Seldon*, 4 F.4th at 157.  In contrast, the "Calculate" buttons in

this case were not on "single screens" like that in *Seldon*.[2] Instead, the user was

required to input a variety of information, the website would scroll (or move

automatically) to the next input line, and then the "Calculate" button and the

notice would appear. The court's consideration of proximity included, but was

not limited to, the location of the terms below the assent button. This location

was more important here than in other cases because the font was also very small

when compared to the assent button, the text was light grey in color as opposed

to a more prominent or contrasting color, and the notice was on a page that

moved dynamically, not a single, static page. While the hyperlinks were blue and

underlined, this too is not necessarily dispositive of the conspicuousness issue,

and is but one factor to be considered. *See e.g.*, *Sadlock v. Walt Disney Co.*, 2023

WL 4869245, at *9-10 (N.D. Cal. July 31, 2023). The court finds no mistake that

would change the outcome of its proximity analysis, which was part of its

consideration of the totality of the circumstances when evaluating

conspicuousness. *See Sadlock*, 2023 WL 4869245, at *9-10 (listing multiple

factors it found relevant to the totality of the circumstances, including that the

---

[2] While the screenshots set forth in the exhibits provided by Rocket differ somewhat from the video, Defendant Rocket stated via affidavit that the video represented the user experience that Dahdah would have had in 2020 and 2021 when he used the website. (ECF No. 11-2, ¶ 39). This suggests that the screenshots found in Exhibits A-1, A-2, and A-3 (ECF Nos. 11-3, 11-4, and 11-5) were also *not* static single screens, but the end of the page after the user inputted information and was automatically moved through the experience.

subscriber agreement was not mentioned until the bottom of the screen, the small font of the paragraph that included the subscriber agreement, the muted text used, that the hyperlink was five lines away from the "agree and subscribe" button, that other distracting elements appeared on the screen, and that the screen was primarily devoted to payment for services.). Accordingly, the court finds no mistake that requires a different outcome and the motion for reconsideration is denied in this regard.

C.    Necessity of Limited Trial

Rocket also argues that if the court denies the motion for reconsideration and upholds the denial of the motion to compel arbitration, it is required to hold a summary trial on the disputed issues of fact regarding whether Dahdah assented to the arbitration provision. However, the court did not find that there was a material dispute of fact. Instead, the court found that Rocket had failed to establish inquiry notice under the first part of the *Berman* test and Dahdah was not bound by the arbitration provision in the Terms of Use. There is no need for a trial because the court decided the issue of conspicuousness as a matter of law.

As explained in *Oberstein v. Live Nation Ent., Inc.*, although mutual assent is generally a question of fact, whether a certain set of facts is sufficient to establish a contract is a question of law. 60 F.4th 505, 517-18 (9th Cir. 2023) (citing *Long v.*

13

*Provide Commerce, Inc.*, 200 Cal. Rptr. 3d 117, 123–24 (2016); *see also Sellers v. JustAnswer LLC*, 289 Cal. Rptr. 3d 1, 23 (2021) ("Because the threshold issue of the existence of a contract is for the courts to decide, the issue of conspicuousness is typically characterized as a question of law.").  Thus, where the authenticity of screenshots is not subject to factual dispute (as in the instant case), courts may decide the issue as "a pure question of law."  *Id*. at 518 (quoting *Long*, 200 Cal. Rptr. 3d at 123–24).

While Rocket takes issue with the "summary judgment" language the court cited from *Daschbach v. Rocket Mortg.,* LLC, 2023 WL 2599955, at *10 (D.N.H. Mar. 22, 2023), which relied on *Meyer v. Uber Techs., Inc.,* 868 F.3d 66, 78-79 (2d Cir. 2017), the *Daschbach* court still concluded (like this court did) that the defendant had failed to establish inquiry notice under the first element of the *Berman* test and denied the motion to compel arbitration.  *Daschbach* did not proceed to trial on the arbitration issue.   Similarly, this court was not required to proceed to a summary trial on the issue of assent and the motion for reconsideration on this issue is denied.

### III.    MOTION FOR LEAVE TO AMEND THE COMPLAINT

#### A.    Legal Standard

Pursuant to Federal Rule of Civil Procedure 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Generally, Rule 15(a)(2) embodies a "liberal amendment policy."  *Brown v. Chapman*, 814 F.3d 436, 442-43 (6th Cir. 2010).  However, leave to amend may be denied when there is "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."  *Id.* at 443.  A proposed amendment is considered futile if "the amendment could not withstand a Rule 12(b)(6) motion to dismiss."  *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

#### B.    Analysis

In Count I of the proposed amended complaint, Dahdah brings a claim for violations of 47 U.S.C. § 227(c) and 47 C.F.R. 64.1200(c), claiming that Rocket made telemarketing calls to him while he was on the Do-Not-Call Registry (DNCR). This corresponds to Count I of the original complaint.  In Count II, Dahdah alleges violations of 47 U.S.C. § 64.1200(d), claiming that Rocket failed to honor direct do-

not-call requests.  This corresponds to Count II of the original complaint.  In Count III, Dahdah makes a claim that Rocket violated 47 C.F.R. § 64.1200(a)(7) by having an abandonment rate exceeding 3% and failing to provide a prerecorded opt-out message on abandoned calls when a live sales representative was not available to speak within two seconds of the called person's greeting.  This corresponds to Count III of the original complaint.  Count IV, Dahdah asserts that he was called at times proscribed by 47 C.F.R. § 64.1200(c)(1), which provides that: "No person or entity shall initiate any telephone solicitation to: (1) Any residential telephone subscriber before the hour of 8 a.m. or after 9 p.m. (local time at the called party's location)."  This corresponds to Count IV of the original complaint.

> 1. *Does the Amended Complaint Sufficiently Plead Threshold Elements for Counts I, II, and IV?*[3]

In the court's previous order granting the motion to dismiss the complaint, it found that Dahdah's claims in Counts I, II, and IV failed to state a claim because he failed to plead that he received more than one telephone solicitation call within any 12-month period, as required by 47 U.S.C. § 227(c)(5).  The court rejected Dahdah's claim that the calls must have been made for a marketing or solicitation purpose without any information regarding the content of the calls.

---

[3] Rocket also makes this argument as to Count III, but the futility of that Count will be addressed separately below.

(ECF No. 26, PageID.308, citing *Katz v. CrossCountry Mortg., LLC*, 2022 WL

16950481, at *6 (N.D. Ohio Nov. 15, 2022) ("Without factual allegations as to the

content of these calls, Plaintiff's FAC fails to properly allege that such calls were

solicitations under the TCPA.")).  Rocket again argues that the proposed amended

complaint suffers from this same defect and thus Counts I, II, and IV fail to state a

claim.

The original complaint merely stated that "Rocket made the calls for the

purpose of selling mortgage products and services."  (ECF No. 1, ¶ 25).  The

proposed amended complaint contains the following allegations:

> 26. On or around June 20, 2022, Rocket began
> making calls to Michael.
>
> 27. Michael recalls that he answered at least one
> of the calls on or around June 20, 2022, and spoke with
> someone who said they were with Rocket and
> offering mortgage products.
>
> 28. On that call he told them to stop calling.
>
> 32. In addition to the calls on or around June 20,
> 2022, there were additional calls during the week of
> June 27, 2022.
>
> 33. The first call at 5:12 am on June 27, 2022,
> woke Michael up. Michael did not answer the call.
>
> 34. Michael answered the next call two and a half
> hours later at 7:45 am…. When someone finally
> connected on the other end of the line, they said they

were with Rocket and offering mortgage products. On this call, Michael indicated he was not interested and again told them to stop calling.

35. On each call that he answered, Rocket indicated that it was calling to try to sell him mortgage refinancing. Michael was not looking to refinance at that time.

(ECF No. 31-1). The foregoing allegations are similar to those found sufficient in

*Delgado v. eMortgage Funding, LLC*, 2021 WL 4776774, at *1 (E.D. Mich. Oct. 13, 2021):

Plaintiff states that she registered her landline on the National Do Not Call ("DNC") Registry on June 1, 2006. *See id.* ¶ 28. She alleges that she received "multiple calls from or on behalf of eMortgage Funding even when she never gave her phone number to the Defendant, despite having her landline residential phone number registered on the DNC to prevent such cold calls and despite making clear requests to the caller for the calls to stop." *Id.* ¶ 19. Plaintiff states that between May 4 and May 14, 2021, she received twenty-four unsolicited calls on her residential landline from the same number, 248-285-9673. *See id.* ¶¶ 30-44.

Although plaintiff did not answer many of the calls and many others disconnected following a short period of silence, plaintiff states that on one occasion, after feigning interest in "the mortgage services being promoted," she spoke with the caller. *Id.* ¶ 42. The caller then transferred plaintiff to a second individual who allegedly indicated that he or she worked for defendant. *See id.* ¶¶ 42-43. Plaintiff states that "[t]his person informed ... Plaintiff that they worked for eMortgage Funding, and that their office was located at 888 W. Big

> Beaver Rd., Suite 1290, Troy, Michigan. The employee
> provided 248-247-3411 as the number the Plaintiff could
> call them back at," which, plaintiff asserts, "belongs to
> Defendant eMortgage Funding." *Id*. ¶ 43. Plaintiff adds
> that after answering a call on May 10, she "spoke with a
> live employee who wanted to speak to Plaintiff about
> her mortgage to promote mortgage services." *Id*. ¶ 37.
> On both May 10 and May 11, plaintiff states that she
> informed the caller that she did not want to be called
> again but that she nonetheless continued to receive calls
> through May 14. *See id*. ¶¶ 37, 39.

The *Delgado* court found that the complaint sufficiently alleged that, on more than one occasion during a twelve-month period, the defendant initiated telephone solicitations to the plaintiff's residential telephone, despite having registered this number on the DNC registry and despite having asked the defendant to stop calling. *Id*. at *5. Similarly, the court finds that Dahdah has now sufficiently alleged that the content of the calls he received from Rocket were for a marketing or solicitation purpose. Accordingly, the proposed amended complaint is not futile in this respect and Counts I, II, and IV are sufficiently plausible.

Rocket also argues, however, that Counts I and IV are futile because Dahdah fails to plead that the challenged calls were uninvited "solicitations." As noted, a telephone solicitation call "does not include a call or message . . . [t]o any person with that person's prior express invitation or permission." 47 C.F.R.

§ 64.1200(f)(15).  Rocket points out that Dahdah admitted in a sworn declaration that he provided his phone number multiple times as part of online requests for mortgage information from Rocket Mortgage and other lenders.  (ECF No. 16-1, ¶ 15).  Dahdah's counsel conceded to the court that Plaintiff provided his phone number to Rocket: "[T]here's been other evidence that has come forth that indicates that [Plaintiff] did go to that website" and "[Plaintiff], in fact, did go to that Lower My Bills website."  (ECF No. 34-1, Tr. at 23-24).  Dahdah's counsel then admitted that Plaintiff consented to the challenged calls: "The fact that my client consented to be called does not change the nature of these being telemarketing calls."  *Id*. at 17.  The proposed amended complaint does not contain the allegation that Dahdah never provided his phone number to Rocket like the original complaint alleged.  (ECF No. 1, ¶ 31).

However, as Dahdah points out in his reply, consent can be revoked and the proposed amended complaint contains allegations that he asked Rocket to stop calling him, and received phone calls after doing so.  (ECF No. 31-1, ¶¶ 28, 34).  Further, consent is an affirmative defense that a plaintiff is not required to plead in order to assert a TCPA claim.  *Hand v. Beach Ent. KC, LLC*, 456 F. Supp. 3d 1099, 1145-46 (W.D. Mo. 2020) (prior express invitation or permission is an affirmative defense); *Ammons v. Ally Fin., Inc.*, 326 F. Supp. 3d 578, 591 (M.D.

Tenn. 2018) (prior express consent is an affirmative defense to liability under the

TCPA); *Shelton v. Direct Energy, L.P.*, 2019 WL 4194179, at *5 (N.D. Ohio Aug. 27,

2019) ("express consent...is not an element of a plaintiff's prima facie case but is

an affirmative defense for which the defendant bears the burden of proof.")

(quoting *Rodriguez v. Premier Bankcard, LLC*, 2018 WL 4184742, at *3 (N.D. Ohio

Aug. 31, 2018) (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037,

1044 (9th Cir. 2017)).  Accordingly, this is not a proper basis on which the court

may find the proposed amended complaint to be futile.

### 2. Did Plaintiff Plausibly Allege that Rocket Failed to Honor his Opt-Out Requests?

Rocket argues that the proposed amended complaint does not plausibly

allege that it failed to honor his do-not-call request.  Dahdah alleges that "[o]n or

around June 20, 2022" he "told [a purported Rocket Mortgage team member] to

stop calling" (ECF No. 31-1, ¶¶ 26-28) and that he again asked Rocket to stop

calling on June 27, 2022.  *Id*. ¶ 34.  He then alleges that Rocket continued to call

him after his request.  *Id*. ¶ 29.  Dahdah identifies the date and time of eight calls

between June 27, 2022 and June 30, 2022, and pleads no calls after June 30.  *Id*.

¶ 32.  Thus, according to Rocket, Dahdah claims that Rocket honored his alleged

request to stop calling within three to nine days, depending on the date of the call

when Plaintiff allegedly made the unidentified request.  *Id*.  Rocket argues that

the TCPA does not require immediate cessation after a do-not-call request; instead the company must honor such a request within a "reasonable time" that does not "exceed 30 days."  47 C.F.R. § 64.1200(d)(3).  The Sixth Circuit has not weighed in on whether a period less than 30 days is *per se* reasonable.  One district court within the circuit has concluded that the reasonableness of a period less than 30 days cannot be determined from the pleadings alone.  *Delgado*, 2021 WL 4776774, at *5 ("Although § 64.1200(d)(3) states that a thirty-day delay in honoring do not call requests is per se unreasonable, it does not state that any shorter delay is per se reasonable. Here, plaintiff allegedly received fourteen additional calls over the four-day period immediately following her request that the calls stop. The Court cannot determine the reasonableness of this delay on the pleadings alone.").  Recent cases in other jurisdictions are in accord with *Delgado*.  *See Menin v. Star Markets Company, Inc*., 2024 WL 4123522, at *5 (D. Mass. Sept. 9, 2024) ("The new FCC rulemaking further substantiates that under the current iteration of the regulations, what constitutes a 'reasonable time' of compliance is a factual question."); *Boger v. Citrix Sys., Inc*., 2020 WL 1033566, at *5 (D. Md. Mar. 3, 2020) (denying motion to dismiss based on two calls received after a do not call request and reasoning that "even if [plaintiff] had first requested placement on the Do-Not-Call list on May 3, 2016, and [defendant]

waited until May 25, 2016 to honor the request, the count still survives dismissal" because the provision "does not, as [defendant] suggests, create a safe harbor for follow up calls places within thirty days after the first call").  Based on the foregoing, the court finds that this claim is not futile.

> 3.   *Does the Proposed Amended Complaint Plausibly Allege that Rocket Failed to Maintain the Requisite Procedure for Maintaining an Internal Do-Not-Call List?*

The court previously found this claim lacking because the original complaint asked "the court to draw a number of inferences regarding the lack of a policy or the failure to implement a policy based solely on the allegation that calls were made after Dahdah made the do-not-call request."  (ECF No. 26, at 14).  Rocket contends that the proposed amended complaint suffers from the same fatal defect.  The court previously analyzed the issue as follows:

> [I]n the court's review, the Complaint still does not cross the threshold of plausibility. "Per the regulations, these internal do-not-call procedures must meet certain minimum standards, including maintaining a written policy for keeping an internal do-not-call list, training personnel engaged in telemarketing, and recording when an individual requests to be put on an entity's do-not-call list." *Adam v. CHW Grp., Inc.*, No. 21-CV-19-LRR, 2021 WL 7285905, at *7 (N.D. Iowa Sept. 9, 2021) (quoting *Hand v. Beach Entertainment KC, LLC*, 456 F.Supp.3d 1099, 1124 (W.D. Mo. 2020) (citing 47 C.F.R. § 64.1200(d)(1)-(6)). In *Adam*, the plaintiff alleged that (1) he asked the defendant to remove him from the call list and to stop contacting him; (2) the defendant failed to

honor that request; (3) the failure to honor the opt-out
request was indicative of (a) a lack of a written policy for
maintaining internal do-not-call procedures, (b) the
defendant's failure to maintain a do-not-call list, (c) the
defendant's failure to inform and train its employees
about the existence and use of the do-not-call list, and
(d) demonstrated that the defendant did not record opt-
out requests or place subscriber's name and telephone
numbers on the do-not-call list when the requests are
made. *Id*. at *9. Similarly, in *Buja v. Novation Cap., LLC*,
No. 15-81002-CIV, 2017 WL 10398957, at *5 (S.D. Fla.
Mar. 31, 2017), the plaintiff alleged that "Defendants did
not have reasonable practices and procedures in place
to effectively prevent telephone solicitations ... as
evidenced by its calls to Plaintiff who repeatedly
requested Defendants stop calling." The court held that
these factual allegations were sufficient to raise a right
to relief above the speculative level and state a plausible
claim. *Id*. Dahdah's Complaint, however, does not
contain allegations similar to those in *Adam* and *Buja*.
Instead, Dahdah asks the court to draw a number of
inferences regarding the lack of a policy or the failure to
implement a policy based solely on the allegation that
calls were made after Dahdah made the do-not-call
request. In light of *Adam* and *Buja*, the court finds that
allegation insufficient. Thus, the claim for an alleged
failure to maintain an internal do-not-call policy/list fails
to state a plausible claim for relief.

(ECF No. 26, pp. 12-14).

The proposed amended complaint alleges that even though Dahdah had

told Rocket multiple times to stop calling, Rocket continued to call to try to sell its

mortgage services up through at least June 30th; more specifically, Rocket

proceeded to call Dahdah two more times on June 27, three more times on June

24

29, and another time on June 30.  (ECF No. 31-1, ¶¶ 37-38).  The proposed

amended complaint also alleges that Rocket is a sophisticated and technologically

advanced company and with this degree of sophistication, size, and automation,

is capable of honoring a consumers' stop request immediately – yet Rocket

purposefully ignores consumers' stop requests in an effort to try to get more bites

at the proverbial apple, in an effort to sell its mortgage services to consumers

who have asked to be left alone.  *Id*. at ¶¶ 39-40.  The proposed amended

complaint further alleges that "Rocket does not have reasonable practices and

procedures in place to effectively prevent telephone solicitations as evidenced by

Rocket's calls to Michael and many others who repeatedly requested Rocket stop

calling but Rocket continued to call."  *Id*. at ¶ 43.  In the court's view, these

allegations are sufficient under *Adams* and *Buja* to state a claim and the proposed

amendment is therefore, not futile.

> 4.    *Has Plaintiff State a Claim Under 47 C.F.R. § 64.1200(a)(7)?*

Previously, the court determined that the complaint failed to state a claim

under 47 C.F.R. § 64.1200(a)(7), which provides as follows:

> (a) No person or entity may:
> * * *
> (7) Abandon more than three percent of all
> telemarketing calls that are answered live by a person,
> as measured over a 30–day period for a single calling
> campaign. If a single calling campaign exceeds a 30–day

> period, the abandonment rate shall be calculated
> separately for each successive 30–day period or portion
> thereof that such calling campaign continues. A call is
> "abandoned" if it is not connected to a live sales
> representative within two (2) seconds of the called
> person's completed greeting.

47 C.F.R. § 64.1200(a)(7).  In its decision, the court explained that to state such a

claim, Dahdah must plausibly allege that no more than 3% of live telemarketing

calls were "abandoned," which means that the call was not connected to a live

sales representative within two seconds of the called person's greeting and this

provision requires information about the abandonment rate, which Dahdah's

complaint failed to mention.  (ECF No. 26, p. 15).

The proposed amended complaint alleges that Rocket abandons a large

percentage of its calls and definitely more than 3%.  (ECF No. 31-1, ¶ 45).  This

allegation is based on two calls made to Dahdah – one where no one came on the

line and the call disconnected and the second where there was a delay of more

than two seconds before someone came on the line.  *Id*. at ¶ 44.  The proposed

amended complaint also points to allegations in *Laccinole v. Rocket Mortgage,*

*LLC*, No. 21-00478 (D.R.I.), where the plaintiff complained of two calls where

there was not anyone on the other end for six seconds or more.  *Id*.  The court

finds it entirely implausible to extrapolate an abandonment rate in excess of 3%

to Rocket based on these four calls.  Additionally, the statute requires that

abandonment rate to be measured over a 30-day period.  Plaintiff's calls here

occurred in June, 2022 and the calls in *Laccinole* occurred in September 2021.

(*Laccinole*, Case No. 21-00478, ECF No. 1, ¶ 34).  Thus, any inference of an

abandonment rate of more than 3% in a 30-day period is even more tenuous.

Accordingly, the proposed amended complaint does not cure the previously

identified defects and is futile as to Count III.

## IV.    CONCLUSION AND ORDER

For the reasons set forth above, the court **DENIES** the motion for

reconsideration and **GRANTS** the motion for leave to amend the complaint in

part.  The court finds Count III in the proposed amended complaint to be futile,

but Plaintiff may file his amended complaint as to Counts I, II, and IV within 14

days of entry of this Opinion and Order.

**SO ORDERED**.

Date: September 26, 2024                    s/F. Kay Behm
                                           F. Kay Behm
                                           United States District Judge